NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1889-12T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ALICE O'DONNELL,

      Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

April 24, 2014

APPELLATE DIVISION

Submitted March 4, 2014 — Decided April 24, 2014

Before Judges Reisner, Ostrer and Carroll.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 05-05-0617.

Joseph E. Krakora, Public Defender, attorney for appellant (Philip Lago, Designated Counsel, on the brief).

Andrew C. Carey, Acting Middlesex County Prosecutor, attorney for respondent (Joie Piderit, Special Deputy Attorney General/ Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Defendant Alice O'Donnell appeals from the trial court's

August 30, 2012, order, after a non-testimonial hearing, denying

her petition for post-conviction relief (PCR), and application to set aside a guilty plea. On March 22, 2006, defendant pleaded guilty to one count of murder, N.J.S.A. 2C:11-3(a). She admitted that between the evening of February 21 and the morning of February 22, 2005, she fed her six-year-old son Phillip an overdose of medication, and held a pillow over his head until he was asphyxiated. After the homicide, defendant stabbed herself multiple times and reportedly ingested rubbing alcohol and twenty or more ibuprofen pills.

In accord with her plea agreement, the court sentenced defendant to a term of thirty years, with a thirty-year parole ineligibility period. We affirmed the conviction; the only issues on direct appeal pertained to the trial court's pre-trial order denying defendant's Miranda[1] motion to suppress inculpatory statements, and partially denying her motion to suppress evidence seized from her home. State v. O'Donnell, 408 N.J. Super. 177 (App. Div. 2009), aff'd o.b., 203 N.J. 160, cert. denied, ___ U.S. ___, 131 S. Ct. 803, 178 L. Ed. 2d 537 (2010).

In this PCR appeal, defendant asserts her attorney was ineffective by failing to diligently pursue a diminished capacity defense. She also alleges that counsel unexpectedly

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

pressed her to plead guilty shortly before trial, without adequate explanation, stating it was necessary to avoid a life sentence. Defendant was forty-four years old when she received the thirty-year sentence under the plea agreement. Defendant essentially contends that she would have proceeded to trial but for trial counsel's ineffective assistance. She seeks to set aside her guilty plea.

Having reviewed the record in light of applicable legal principles, we conclude defendant has presented a prima facie case of ineffective assistance of counsel and resulting prejudice. We also conclude that the trial court misapplied the factors governing an application to withdraw a guilty plea. We therefore reverse and remand for an evidentiary hearing.

## I.

We discern the following facts from the record, considering defendant's contentions "indulgently and . . . in the light most favorable to [her]." State v. Cummings, 321 N.J. Super. 154, 170 (App. Div.), certif. denied, 162 N.J. 199 (1999). The record includes the testimony of defendant and several police officers from the pre-trial hearing on the motion to suppress,

defendant's interview with two mental health experts, their expert reports, and other documentary evidence.[2]

Defendant had a history of mental illness and psychiatric hospitalizations. Her family also had a history of mental illness. She reported that when she was a child, her father subjected her, and one of her sisters, to violent sexual abuse. Attempts to report the abuse were rebuffed. The sister later committed suicide. Defendant has three living siblings: two other sisters, and a brother who is disabled with schizophrenia.

In the months before the homicide, defendant experienced various reversals in her life. Her partner of over twenty years, Phyllis, died in 2004. Along with the emotional loss, defendant suffered financially thereafter. Phyllis had helped support defendant and her son Phillip. Neither defendant nor Phillip had a continuing relationship with Phillip's father, who had disappeared from their lives.

Sometime after Phyllis's death, defendant was forced to vacate her apartment. After temporarily residing with her mother in a senior community, she moved to Highland Park, but soon faced eviction. In the meantime, defendant believed that her son had been sexually abused by a priest who had spent time

---

[2] Defendant's custodial statement was not presented to us. However, we rely on the trial court's summary of the statement included in its Miranda decision.

with him.  She reported the alleged assault to a school guidance counselor, who referred the matter to the Division of Youth and Family Services.

Defendant believed that her impending homelessness would cause her to lose custody of her son, and result in his continued abuse.  At the time of the homicide, she was prescribed medications for insomnia (Soma), depression (Zoloft), and anxiety (Klonopin).  However, she stated that as a result of Medicaid issues, she was unable to fill her Zoloft prescription. She determined that the solution to her predicament was to send her son and herself to heaven, where they would join Phyllis. She reportedly heard a soft voice that said, "'God and Jesus welcomes you, go to God, they always want you.'"  Defendant claimed to have conferred with her son about her plan and he consented to it.

The day before the homicide, she informed her sister Theresa and other family members that they could come to her apartment to take her furniture.  There is no evidence she told them that she intended to harm herself or her son.  Defendant told them she was about to become homeless.

Defendant stated she gave her son a combination of Benadryl and Klonopin on the evening of February 21, 2005.[3] When that prompted Phillip to vomit, defendant smothered him with a pillow. Defendant's two sisters arrived at her home the next morning, and awoke defendant, who was asleep beside her deceased son. She testified that she told her sisters that she and Phillip "were going to heaven." Upon their discovery that Phillip was dead, her sisters summoned the police.

Defendant was generally non-responsive to a police officer's initial inquiries at the scene regarding what had happened. She appeared "out of it" to one officer, and disheveled and disoriented to another. But, she admitted she gave Benadryl to Phillip, and, regarding what medication she took, "[s]he began to ramble on naming different medications."[4]

Defendant was indicted and arraigned in May 2005. The defense's apparent strategy was to pursue a diminished capacity defense under N.J.S.A. 2C:4-2. The court ordered the assistant deputy public defender to seek approval to hire a mental health expert. However, counsel delayed several months, and then misrepresented that he had provided materials to the expert

---

[3] The Medical Examiner reported that Phillip died from acute Zoloft and Benadryl poisoning, and "'mechanical asphyxia.'"

[4] The police seized various documents and handwritten notes from defendant's home, which are not part of the record before us.

several weeks before he actually did. The defense missed the court's November 11, 2005, deadline for submitting its report.

Defense counsel's delays prompted a State motion to bar an expert report and any defense based on insanity or diminished capacity. The defense did not serve the report of its psychiatric expert, Oscar Sandoval, M.D., until January 24, 2006, the return date of the State's motion. Dr. Sandoval concluded that defendant's "mental capacity was so impaired that she was unable to engage in purposeful conduct."

The court denied the State's motion, stating it would cause undue prejudice to defendant. Yet, the judge stated, "I do not, however, wish to minimize the importance of the dereliction here." The judge found defense counsel "failed to pay reasonable attention" to the matter, and misled the court about his progress. The court imposed a $250 monetary sanction. Defense counsel responded he was experiencing financial difficulties, and would be unable to pay the fine promptly.

The court tentatively scheduled trial for February 27, predicated on the State serving its expert's report on February 17. However, those deadlines were not met. The State served the report of its psychological expert, Anthony V. D'Urso, Psy.D., on March 7, 2006. Before doing so, the State provided additional discovery to the defense on February 8, 2006. The

discovery and Dr. D'Urso's report challenged defendant's diminished capacity defense, as supported by Dr. Sandoval.

Dr. Sandoval concluded defendant suffered from a severe Major Depressive Disorder "with mood congruent, psychotic features," severe Post-Traumatic Stress Disorder, and a Dependent Personality Disorder. Dr. Sandoval opined that defendant was responding to voices of command, to alleviate her son's suffering. He opined defendant was psychotic, but not psychopathic.

> Ms. O'Donnell was verbalizing auditory hallucinations with voices of command. . . .
>
> . . . .
>
> Her psychotic act of filicide occurred impulsively without prior homicidal thoughts or rage, driven by the auditory hallucinations of command; which led her to believe that by killing her child, this was an altruistic act to save her son, Phillip, from the world.

The State's discovery materials included various documents pertaining to a 2003 insurance fraud investigation involving defendant by the State Division of Criminal Justice (DCJ). The unsworn documents indicated that defendant falsely represented that she was a licensed Ph.D. psychologist. In fact, defendant never obtained a college degree, although she earned substantial credits at both Kean and Rutgers Universities. A mental health center in Bayonne hired defendant in March 2002. She signed

health insurance claim forms as a licensed psychologist. A health insurer discovered her misrepresentation, prompting her dismissal at the end of May 2002.

According to a February 9, 2006, hearsay report of a Middlesex County investigator, a former billing clerk of the mental health center stated that Dr. Sandoval worked at the mental health center at the same time as defendant; the psychiatrist and defendant knew each other; the psychiatrist met with patients defendant purportedly treated, and reviewed and signed defendant's billing statements. However, the same witness's sworn statement from November 2003 did not mention Dr. Sandoval, and a DCJ investigator's report in 2003 quoted her as saying that Dr. Sandoval became involved in the mental health center only after defendant left. Dr. Sandoval asserted the same in his interview with DCJ investigators in 2003. DCJ's report referred to a different physician as the psychiatrist to whom the center referred patients while defendant was on staff. Defendant admitted that she also was treated at the time by that physician, not Dr. Sandoval.

With regard to defendant's diminished capacity, Dr. D'Urso rejected Dr. Sandoval's opinion that defendant lacked the ability to form the intent to commit murder. Dr. D'Urso concluded that defendant was a pathological liar who suffered

from a lack of self-esteem. He administered various psychological tests, and obtained what he considered valid responses. They indicated "a pattern of chronic psychological maladjustment resulting in ineffective interpersonal relationships." He stated her profile suggested "marked depression," the suggestion of "delusional, circumstantial and tangential thinking," "the presence of psychotic thought," and "somatic delusions and schizoid functioning, including the need for psychopharmacological interventions." Nonetheless, he concluded defendant did not lack the mental state necessary to commit murder:

> [S]he was purposeful enough to re-administer Benadryl and ultimately to smother her son. Given a transient psychotic state, it would appear that she was capable of committing both homicide and suicide. . . . Ms. O'Donnell was able to understand her conduct at the time of the offense and able to form intent and as such was responsible for her actions.

Roughly two weeks after Dr. D'Urso's report was served, and five days before the newly-scheduled trial date of March 27, 2006, defendant pleaded guilty to the indictment, conditioned on the State's promise to recommend a thirty-year sentence, with a thirty-year period of parole ineligibility. Consistently responding to leading questions with yes or no answers, defendant affirmed that she wished to plead guilty, she was

10

doing so voluntarily and knowingly, and she was satisfied with her attorney. She affirmed to her attorney that she gave her son an overdose of medicine, and smothered him with a pillow, with the purpose to cause his death.

The court alluded to the diminished capacity defense:

> THE COURT: Do you also understand if I accept this plea to the extent that you may have had some defense, you'll be waiving that defense, whatever defense you might have had, that you acknowledge responsibility as you are here and if I accept that acknowledgement of responsibility. Do you understand that?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Is it your desire to waive any defense that you might have and ask me to accept the plea today?
>
> THE DEFENDANT: Yes.

The court sentenced defendant in accord with the plea agreement on May 5, 2006. As noted above, the direct appeal only addressed suppression issues.

Defendant filed her pro se PCR petition on September 7, 2011. She alleged that after learning the United States Supreme Court denied certiorari in December 2010, she wrote to her assistant deputy public defender to inquire about the next step, but received no response. She attributed to her depression the ensuing delay in the filing of the petition, four months beyond the five-year period following her judgment of conviction.

In her pro se petition, and later amended petition prepared by counsel, defendant asserted her trial attorney was ineffective by: (1) failing to confer adequately with her about the State's plea offer, and his defense preparations; (2) failing to pursue the diminished capacity defense, including failing to obtain a second psychiatric evaluation; and (3) generally failing to attend to the case because of personal problems. Defendant asserted that defense counsel visited her the evening before the plea hearing and told her, "'I've got bad news, you've got to take a plea or you're going to get life.'" She alleged that he had previously advised her that she would prevail on her diminished capacity defense. She alleged, "A second psychiatric evaluation by a Dr. Greenberg was begun but never completed. . . . The incomplete psychiatric examination process rendered counsel unable to present and support a diminished capacity defense at trial." She asserted he failed to obtain her "informed consent" before announcing in court the next day that she would plead guilty.

Defendant argued she was entitled to withdraw her plea under State v. Slater, 198 N.J. 145 (2009), and was entitled to PCR under Strickland v. Washington, 466 U.S. 668, 104 S. Ct.

2052, 80 <u>L. Ed.</u> 2d 674 (1984).[5] She also asserted her four-month delay resulted from excusable neglect.

The State opposed relief, filing a brief to which it attached various exhibits, including the mental health evaluations and, apparently, all the discovery materials produced in February 2006. The State relied substantially on defendant's affirmation at the plea hearing that she wished to plead guilty, she was generally satisfied with her attorney's performance, and agreed to waive any defenses. The prosecutor also argued that Dr. Sandoval would have been discredited based on evidence that he and defendant allegedly were in practice together, and he approved her claim forms. The prosecutor further contended that if defendant testified, she would also be discredited by the evidence of her misrepresentation of her credentials.[6]

After oral argument, the court denied defendant relief. The judge separately found defendant had failed to meet the test for withdrawing a plea under <u>Slater</u>, and failed to demonstrate a

---

[5] Defendant did not file a separate, free-standing plea withdrawal motion under <u>Rule</u> 3:21-1.

[6] Allegations of defendant's prior misrepresentation would appear to constitute evidence of other crimes or wrongs. <u>N.J.R.E.</u> 404(b). The State did not address how it would have established a basis for admissibility. <u>See</u> <u>State v. Cofield</u>, 127 <u>N.J.</u> 328, 338 (1992).

prima facie case of ineffective assistance of counsel under Strickland.

Regarding plea withdrawal, the court applied the four Slater factors: "(1) whether the defendant has asserted a colorable claim of innocence; (2) the nature and strength of defendant's reasons for withdrawal; (3) the existence of a plea bargain; and (4) whether withdrawal would result in unfair prejudice to the State or unfair advantage to the accused." Supra, 198 N.J. at 157-58. The court summarized the competing opinions of Drs. Sandoval and D'Urso and found "this colorable claim of innocen[c]e . . . seems to be in equipoise." The court found that defendant's reasons for withdrawal — lack of consultation by her attorney and viability of her diminished capacity defense — were belied by her waiver of defenses at the plea hearing. The existence of a plea agreement also weighed against defendant. The court held that it was not required to consider the fourth factor, as the balance of the first three did not favor defendant.

The court then applied the first prong of the test under Strickland, supra, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693 (stating that defendant must show counsel's performance was deficient and he or she made errors so serious that counsel was not functioning as guaranteed by the Sixth

Amendment). The court found that defendant and her attorney "were on notice" that the State would question defendant's credibility, and challenge Dr. Sandoval's opinion, in part by alleging a lack of candor and objectivity based on his alleged business relationship with defendant. The court found "there is no evidence to prove that plea counsel did not review all of these facts with [defendant]." The court was also unpersuaded that trial counsel failed to apply "professional and/or trial strategy" in urging defendant "not to go to trial but to enter a guilty plea." The court also reviewed defendant's affirmations, in response to her trial counsel's questioning, that he had conferred with her earlier that day, reviewed the plea form, and that she voluntarily and freely wished to plead guilty and waive her right to a trial. The court did not expressly reach the prejudice prong of the Strickland test. See Strickland, supra, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698 (defendant must show he or she was prejudiced such that there existed a reasonable probability that, but for counsel's unprofessional errors, the result would have been different).

The judge did not decide whether defendant's application was time-barred, in view of its disposition on the merits. However, the judge opined that "frankly, four months after the running of the five-year time period with all of the various

15                                          A-1889-12T2

appeals that were part of the record there appears to be a significant case in favor of the petitioner for this argument of excusable neglect."

This appeal followed. Defendant presents the following point and subpoints for our consideration:

> THE LOWER COURT ERRED IN NOT GRANTING DEFENDANT'S REQUEST FOR AN EVIDENTIARY HEARING. THE LOWER COURT ORDER MUST THEREFORE BE REVERSED AND THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING.
>
> A) Defendant has asserted a colorable claim of innocence.
>
> B) The nature and strength of defendant's reasons for withdrawal are powerful.
>
> C) A plea bargain exists in this case; however, the plea offer was not accepted knowingly and voluntarily.
>
> D) Withdrawal of the plea would not result in unfair prejudice to the State or unfair advantage to the defendant.

## II.

### A.

The trial court correctly viewed defendant's application as both a motion to withdraw her plea, and a petition for PCR based on ineffective assistance of counsel.[7] The two requests for

---

[7] We do not reach the issue whether, under Rule 3:22-3, the trial court should have held the PCR petition in abeyance, or dismissed it without prejudice, until it considered the plea withdrawal request. Neither the parties nor the trial court
(continued)

relief are distinct, and governed by different rules of court. Compare R. 3:21-1 (motion to withdraw plea), with R. 3:22 (PCR). They must be considered separately. Cf. State v. McDonald, 211 N.J. 4, 15-26, 29-30 (2012) (separately analyzing motion to withdraw guilty plea under Slater, and claim of ineffective assistance under Strickland, although finding that ineffective assistance claim was premature on direct appeal).

The two requests for relief are governed by different time constraints. A motion to withdraw a plea shall be made before sentencing, but may be made at any time thereafter if the movant shows a "manifest injustice." R. 3:21-1; see also State v. J.J., 397 N.J. Super. 91, 97 (App. Div. 2007), appeal dismissed, 196 N.J. 459 (2008). By contrast, a petition for PCR must be filed within five years of the challenged judgment of conviction, absent excusable neglect where enforcement of the bar would result in a "fundamental injustice." R. 3:22-12(a).

---

(continued)
addressed that issue, and the interests of justice would not be served by bifurcating the proceedings at this point, particularly given the time that has elapsed since defendant's conviction. See Report of Supreme Court Committee on Post-Conviction Rights of Indigents, 85 N.J.L.J. 557, 568 (1962) (regarding proposed rule on exclusiveness of post-conviction application, stating that "[s]ome degree of flexibility in the jurisdictional handling of particular cases will inevitably arise" and "priority will be accorded the objective of substantial justice").

The two applications implicate different but overlapping rights. The motion to withdraw a plea implicates fundamental rights to liberty and due process. See Slater, supra, 198 N.J. at 158 ("A core concern underlying motions to withdraw guilty pleas is to correct the injustice of depriving innocent people of their liberty."). The right to PCR based on ineffective assistance is grounded in the constitutional right to counsel. See State v. Fritz, 105 N.J. 42, 57-58 (1987) (stating that Strickland vindicates the constitutional right to counsel). More broadly, however, "a PCR petition is a defendant's last chance to challenge the 'fairness and reliability of a criminal verdict in our state system.'" State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. Feaster, 184 N.J. 235, 249 (2005)).

As we have noted, the motion to withdraw a plea is governed by the four-factor test in Slater, supra. No one factor is dispositive, nor must a movant satisfy all four. 198 N.J. at 162. However, "[c]onsideration of a plea withdrawal request can and should begin with proof that before accepting the plea, the trial court followed the dictates of Rule 3:9-2." Id. at 155. The rule requires the court to determine if "there is a factual basis for the plea and that the plea is made voluntarily, not as a result of any threats or of any promises or inducements not

disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea." R. 3:9-2.

A petition for PCR based on ineffective assistance of counsel is governed by the two-prong Strickland test. In a challenge to a conviction arising from a guilty plea, the petitioner may satisfy the prejudice prong by showing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203, 210 (1985); see also State v. Gaitan, 209 N.J. 339, 351 (2012), cert. denied, ___ U.S. ___, 133 S. Ct. 1454, 185 L. Ed. 2d 361 (2013).

To obtain an evidentiary hearing on a PCR petition, a defendant must establish a prima facie case for relief, material issues of disputed fact, and show that an evidentiary hearing is necessary to resolve the claims. R. 3:22-10(b). The petitioner must ultimately establish the right to PCR by a preponderance of the evidence. State v. Preciose, 129 N.J. 451, 459 (1992).

Regarding a plea withdrawal motion, the burden of proof varies depending on when the motion is filed.

> The same factors are to be used for motions filed either before or after sentencing, but the timing of the motion will trigger different burdens of proof for the movant: pre-sentence motions to withdraw a plea are governed by the "interest of justice"

standard in <u>Rule</u> 3:9-3(e), while post-sentence motions are subject to the "manifest injustice" standard in <u>Rule</u> 3:21-1. As a result, the weighing and balancing process will differ depending on when a motion is filed . . . .

[<u>Slater</u>, <u>supra</u>, 198 <u>N.J.</u> at 158.]

"Following sentencing, if a defendant seeks to withdraw a guilty plea the court weighs more heavily the State's interest in finality and applies a more stringent standard." <u>State v. Norman</u>, 405 <u>N.J. Super.</u> 149, 160 (App. Div. 2009) (citing <u>State v. McQuaid</u>, 147 <u>N.J.</u> 464, 485-87 (1997)). Thus, the longer a defendant delays in seeking to withdraw a plea, the greater burden he or she will bear in establishing "manifest injustice," because the prejudice to the State under prong four will generally increase. Moreover, a defendant's reasons for delay may also weigh against relief under factor two.

We recognize that the two tests may overlap. For example, compelling evidence of a person's innocence that was available but neglected by an attorney may weigh heavily in applying factor one of the <u>Slater</u> test, as well as determining whether an attorney's ineffectiveness was prejudicial under <u>Strickland</u>. A defendant may rely on discovery of his or her attorney's misinformation about the consequences of a plea to satisfy the reasons for seeking to withdraw a plea under <u>Slater</u> factor two. Those same facts may satisfy prong one of <u>Strickland</u>.

However, a court must nonetheless view the applications separately, and must avoid conflating the two. One can imagine scenarios in which a defendant could prevail on one application, but not the other. For example, a defendant may mislead his or her attorney in accepting responsibility for a crime, in order to plead guilty and to avoid threatened reprisals by another criminal. Cf. State v. Simon, 161 N.J. 416, 444-46 (1999) (affirming trial court's decision considering, but discrediting defendant's claim, on motion to withdraw plea, that he falsely admitted guilt because of threats to his family). While such a defendant might have no viable claim for PCR based on ineffective assistance, he or she conceivably could have a viable plea withdrawal motion, based on a colorable claim of innocence and compelling reasons for seeking withdrawal.

On the other hand, a defendant may fail on a motion to withdraw a plea under Slater, because he or she lacks a colorable claim of innocence (factor one), and the State would suffer prejudice (factor four) as a result of delay and witness unavailability. Yet, the same defendant may still have a successful claim under Strickland, because (1) the defendant may establish prejudice without necessarily establishing likely acquittal; and (2) prejudice to the State is not a consideration under Strickland. In the PCR context, to obtain relief from a

21

conviction following a plea, "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. ___, ___, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284, 297 (2010). "[A] rational decision not to plead guilty does not focus solely on whether a defendant would have been found guilty at trial . . . ." United States v. Orocio, 645 F.3d 630, 643 (3d Cir. 2011), overruled on other grounds by Chaidez v. United States, ___ U.S. ___, 133 S. Ct. 1103, 185 L. Ed. 2d 149 (2013). In a case involving immigration consequences of a plea, "[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." Padilla, supra, 559 U.S. at ___, 130 S. Ct. at 1483, 176 L. Ed. 2d at 295 (internal quotation marks and citations omitted).

In State v. Nuñez-Valdéz, 200 N.J. 129 (2009), the Court affirmed PCR where counsel misinformed the defendant about the immigration consequences of conviction. The defendant would not have pleaded guilty had he been properly informed. Although the defendant claimed he falsely admitted his guilt, id. at 133, "[d]efendant conceded that his change of heart had nothing to do with any assertion of innocence." Id. at 149. Neither the

trial court nor the Supreme Court relied on evidence of innocence as a factor in granting relief.

Finally, we apply different standards of review to orders on plea withdrawal motions, and PCR petitions. While issues of law are subject to our de novo review, Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), we apply an abuse of discretion standard to decisions on plea withdrawal motions. "Thus, the trial court's denial of defendant's request to withdraw his guilty plea will be reversed on appeal only if there was an abuse of discretion which renders the lower court's decision clearly erroneous." See Simon, supra, 161 N.J. at 444 (citing State v. Smullen, 118 N.J. 408, 416 (1990)). "A denial of a motion to vacate a plea is 'clearly erroneous' if the evidence presented on the motion, considered in light of the controlling legal standards, warrants a grant of that relief." State v. Mustaro, 411 N.J. Super. 91, 99 (App. Div. 2009) (citing Slater, supra, 198 N.J. at 164). Our Supreme Court has found a mistaken exercise of discretion in denying a motion to withdraw a plea where the court exercised a "clear error of judgment." State v. Munroe, 210 N.J. 429, 448 (2012) (internal quotation marks and citation omitted).

If a court has conducted an evidentiary hearing on a petition for PCR, we necessarily defer to the trial court's

factual findings. <u>Nash</u>, <u>supra</u>, 212 <u>N.J.</u> at 540. Moreover, "<u>Rule</u> 3:22-10 recognizes judicial discretion to conduct such hearings." <u>Preciose</u>, <u>supra</u>, 129 <u>N.J.</u> at 462. However, where the court does not hold an evidentiary hearing, we may exercise de novo review over the factual inferences the trial court has drawn from the documentary record. <u>State v. Harris</u>, 181 <u>N.J.</u> 391, 420-21 (2004), <u>cert. denied</u>, 545 <u>U.S.</u> 1145, 125 <u>S. Ct.</u> 2973, 162 <u>L. Ed.</u> 2d 898 (2005). Thus, it is within our authority "to conduct a <u>de novo</u> review of both the factual findings and legal conclusions of the PCR court." <u>Id.</u> at 421.

B.

Applying these principles, we are persuaded that the trial court misapplied the <u>Slater</u> factors in denying defendant's application to withdraw her plea.

Turning to the first <u>Slater</u> factor, the court set too high a threshold for establishing a "colorable claim of innocence." <u>Slater</u>, <u>supra</u>, 198 <u>N.J.</u> at 158. The court found that this factor was neutral because defendant's diminished capacity defense — supported by Dr. Sandoval's opinion — was challenged by the State's expert, Dr. D'Urso and other evidence. However, in applying this factor, a court should not decide the likelihood of the defense prevailing. <u>Munroe</u>, <u>supra</u>, 210 <u>N.J.</u> at 446 (holding that the court misapplied <u>Slater</u> factor one).

"Rather, the issue is whether defendant raised a colorable claim of innocence that should rightly have been decided by a jury." Ibid. A court must consider whether "defendant 'presented specific, potentially plausible facts' of his innocence." Id. at 446-47 (quoting Slater, supra, 198 N.J. at 162-63).

By this standard, defendant's diminished capacity defense was a colorable claim of innocence. The court did not expressly consider that once defendant raised the question of her mental disease or defect, it was the State's burden to disprove her diminished capacity beyond a reasonable doubt. State v. Rivera, 205 N.J. 472, 487 (2011); State v. Moore, 122 N.J. 420, 431 (1991); Model Jury Charge (Criminal), "Evidence of Mental Disease or Defect" (2006).[8] It is notable that although Dr. D'Urso opined that defendant likely had the necessary mental state, he also confirmed that defendant suffered from several serious mental health conditions.

The court also gave undue weight to the State's claim that Dr. Sandoval had a conflict of interest based on his alleged relationship with defendant. The claim was grounded in an unsworn 2006 investigative report stating the billing clerk

---

[8] By contrast, a defendant bears the burden of proving insanity by a preponderance of the evidence. State v. Singleton, 211 N.J. 157, 174 (2012); N.J.S.A. 2C:4-1.

asserted such a relationship. However, that same clerk in 2003 told DCJ investigators no such relationship existed.

The PCR court also erred in rejecting, out of hand, the "nature and strength of defendant's reasons for withdrawal." Slater, supra, 198 N.J. at 159. The court relied solely on defendant's affirmations at the plea hearing, which it held belied her claim she was ill-informed about her defenses and pressured to plead guilty. The court also discounted defendant's claim of inadequate consultation by counsel.

We recognize that a defendant's representations "at plea hearings concerning the voluntariness of the decision to plead . . . constitute a 'formidable barrier' which defendant must overcome before he will be allowed to withdraw his plea." Simon, supra, 161 N.J. at 444. However, at defendant's plea hearing, the court fell short of conducting the searching inquiry required to assure that a defendant has knowingly and voluntarily waived a claim as significant as diminished capacity. Our Supreme Court recently held in State v. Handy, 215 N.J. 334, 362 (2013), that before a trial court accepts a waiver of the insanity defense, the court must conduct a "thorough and searching inquiry of an otherwise competent defendant concerning his or her understanding of the nature of the right being waived and the implications that flow from that

choice." We presume no less is required here. Yet, the court failed even to identify the diminished capacity defense by name, let alone describe the nature of the defense, its significance, and inform defendant that the State would bear the burden to disprove diminished capacity.

As for factor two, defendant's claim that her trial counsel did not adequately confer with her, and share the risks and benefits of pleading, was more than a bald assertion. Cf. Cummings, supra, 321 N.J. Super. at 170. Defendant's assertions were supported by counsel's prior derelictions and misrepresentations, which the court found when it sanctioned trial counsel. The PCR court minimized counsel's past behavior, stating it pertained only to the production of the expert report. However, counsel's behavior at the very least lent plausibility to defendant's claim that her attorney, after representing that she had a viable defense, did not adequately confer with her, failed to exercise diligence in obtaining a promised second expert report, and then suddenly and urgently advised her to switch course and plead guilty.

We conclude that an evidentiary hearing is required to fairly assess defendant's asserted reasons for seeking to withdraw her plea, and her allegations regarding trial counsel. Upon completion of such a hearing, and in view of our comments

regarding the "colorable claim of innocence" prong, the trial court shall reconsider the application to withdraw defendant's plea. In doing so, the court should also analyze prong four.

C.

Considering defendant's request for PCR, we agree with the trial court's initial view that defendant's petition is not time-barred by Rule 3:22-12. She established excusable neglect under the circumstances, particularly since she filed only a few months past the deadline. Defendant has also established "fundamental injustice," as required by Rule 3:22-12(a)(1), as she made "some showing that an error or violation played a role in the determination of guilt." Nash, supra, 212 N.J. at 547 (internal quotation marks and citation omitted).

Turning to the Strickland test, we are persuaded that defendant established a prima facie claim of ineffective assistance of counsel. Defendant has presented more than bald or conclusory allegations that her attorney's performance fell "outside the wide range of professionally competent assistance." Strickland, supra, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. As we have discussed, defendant presented a plausible claim, supported by the court's finding of misrepresentation and dereliction of professional duty, that her attorney failed to confer with her or obtain a second expert

opinion as promised, and urged her to plead guilty without adequate explanation despite months of preparation for trial.

Defendant's claim of diminished capacity was supported by an expert opinion, and indirectly supported by defendant's history of mental illness. Certainly, a jury may have been persuaded to reject Dr. Sandoval's opinion, or that of another defense expert. Acquittal was far from certain. Yet, it is not self-evident that pleading guilty was a reasonable strategy, particularly since the agreement called for a plea to the indictment, and a sentence resulting in defendant's incarceration until age seventy-four. Upon a hearing, trial counsel may well provide a basis for concluding that his advice to defendant was the result of "reasonable professional judgment." Strickland, supra, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694-95. However, on this record, and extending defendant all favorable inferences, she has established a prima facie case regarding prong one.

As for the prejudice prong, defendant has presented sufficient evidence to show "a reasonable probability that, but for counsel's errors, [s]he would not have pleaded guilty and would have insisted on going to trial." Hill, supra, 474 U.S. at 59, 106 S. Ct. at 370, 88 L. Ed. 2d at 210. Her readiness to go to trial is plausible, because she had a plausible defense

that she could present through her expert's and perhaps her own testimony.

Her readiness to go to trial is also supported by the nature of the plea offer. This is not a case where the plea offer was so attractive that it would defy logic or reason that a defendant would risk a trial. See Mustaro, supra, 411 N.J. Super. at 106-07. Defendant pleaded to the indictment and accepted a sentence that could result in her spending the rest of her life in prison. We conclude defendant has made a prima facie showing that going to trial would have been "rational under the circumstances." Padilla, supra, 559 U.S. at ___, 130 S. Ct. at 1485, 176 L. Ed. 2d at 297. Defendant's claim that she would have insisted upon going to trial had she been effectively counseled cannot be rejected absent an evidentiary hearing.

In sum, we reverse and remand for the court to conduct an evidentiary hearing and to reconsider defendant's application for relief under Slater and Strickland.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION